IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| DONALD R. DEWBERRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 3:06CV332-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Donald R. Dewberry brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and Supplemental Security Income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On March 10, 2004, plaintiff filed applications for disability insurance benefits and Supplemental Security Income.[1] On October 25, 2005, after the claim was denied at the

---

[1] In his application, plaintiff alleged disability since July 1, 2003. (R. 54). At the hearing, plaintiff's counsel argued that the appropriate onset date was May 1999. (R. 246). Pursuant to a previous application for disability insurance benefits and Supplemental Security Income, the Commissioner found plaintiff disabled as of May 6, 1999 but later terminated benefits, with plaintiff's last payment in October 2002. Accordingly, the ALJ determined that the appropriate alleged onset date should be November 1, 2002. (R.

initial administrative levels, an ALJ conducted an administrative hearing. The ALJ rendered a decision on January 6, 2006. The ALJ concluded that plaintiff suffered from the severe impairments of "[c]oronary heart disease, status post acute myocardial infarction with stent placement, mild chronic obstructive pulmonary disease, degenerative disc disease of the cervical spine, status post arthrodesis at L2-4, and status post fracture of the right ankle." (R. 15). The ALJ found that plaintiff has non-severe impairments of status post hairy cell leukemia and history of alcohol abuse. (Id.). The ALJ determined that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On February 24, 2006, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

**STANDARD OF REVIEW**

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

---

14 n. 1).

(11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff asserts that he is disabled because of back and shoulder pain, numbness in his arm and leg, and heart trouble. (R. 60, 250). Although plaintiff had a heart attack and stent placement in the past, he described his current heart problems as "not bad." (R. 251). He further testified that he had leukemia – in remission since 1998 – and that he had previously suffered a broken back and broken ankle. (R. 252-54). He testified that he has not been to a doctor since 2000, other than the consultative examiner, because he cannot afford to go to the doctor, and that he is not taking medication because he cannot afford it. He testified that he can walk only about 100 yards before "pain sets in," that he can stand for about 30 minutes and sit for about 45 minutes. He cannot bend over unless he has something to hold onto. He cannot stand in the shower for long. When he cooks, he usually makes a sandwich. He does a "little bit" of household chores each day, and mostly sits and watches television. He goes shopping about three times a month. He characterized his pain as a level

3

six on a scale of ten.  (R. 254-55).

The medical evidence of record reveals that plaintiff fell on December 24, 1995, causing a bimalleolar fracture of his right ankle.  He was admitted for surgery, and was treated by Dr. Whatley of the Orthopaedic Clinic in follow-up appointments over the next three months.  (Exhibit 7F).

In March 1997, plaintiff was admitted to East Alabama Medical Center for two and a half weeks for treatment of abdominal and chest wall abscesses with probable Staphylococcus infection.  He was also diagnosed with "leukopenia of undetermined etiology."  (Exhibit 3F; R. 120).  The following month, plaintiff was diagnosed with hairy cell leukemia and admitted to East Alabama Medical Center for a one-week course of chemotherapy.  (Exhibit 4F).

Two years later, in May 1999, plaintiff was involved in a single-car motor vehicle accident.  His car went over an embankment and rolled two to three times, causing him to suffer a loss of consciousness and an "L-3 burst fracture with canal compromise." The following day, plaintiff had surgery – arthrodesis of the L3 burst fracture.  He remained in the hospital for six days.  (Exhibit 8F).

On July 18, 1999, plaintiff was admitted to East Alabama Medical Center through the emergency room after he suffered an acute myocardial infarction.  He was diagnosed with severe coronary disease and was discharged ten days after admission following a heart catheterization and angioplasty with stent implantation. (Exhibit 5F).  A cardiac electrophysiological protocol performed on September 3, 1999 showed "no inducible ventricular arrhythmias." (R. 143-44). On November 8, 1999, plaintiff was evaluated in the

emergency room for complaints of left shoulder pain and tingling of his left hand. (R. 140-41).

Almost two years later, on September 6, 2001, plaintiff reported to the emergency room complaining of "hurting all over." He stated that his left arm and shoulder had hurt for two years and had been numb intermittently for two weeks. He told the physician that he drinks four shots of liquor "or a little bit more" every day because of his pain, and he smokes two packs of cigarettes per day. His examination was unremarkable, except for x-ray evidence of degenerative changes in plaintiff's neck and a blood alcohol level of 167. (R. 137-38).

There are no records of further medical treatment or examination until plaintiff's consultative examination on May 3, 2004. (Exhibit 1F). After examining the plaintiff, the consultative physician concluded:

> He is limited, by personal history, in his duration of sitting, walking, and standing. Functionally, he moves fairly well. He does not have limitations in had dexterity or communication. He does not use an assistive device for ambulation at this time. It is of note that he was witnessed walking out to the car without difficulty, and I think he could extend beyond his stated 50 yard limit. However, with his many years of smoking and his coronary artery disease on top of the COPD, I am sure he has functional limitations in his activities. Furthermore, he is going to have some limitation due to his right ankle surgery and possibly due to his chemotherapy/leukemia.

(R. 101).

Plaintiff's Allegations of Pain and Functional Limitations

Plaintiff argues that the ALJ erred in discounting plaintiff's testimony of disabling pain and functional limitations. (Plaintiff's brief, pp. 10-13). In the Eleventh Circuit, a

claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  "The standard also applies to complaints of subjective conditions other than pain." Holt, *supra*, 921 F.2d at 1223.  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  After considering the testimony, the ALJ may reject the claimant's subjective complaints.  However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id.  The reasons articulated by the ALJ must be "explicit, adequate, and supported by substantial evidence in the record."  Preston v. Barnhart, 2006 WL 1785312, *1 (11th Cir. Jun. 29, 2006)(unpublished opinion)(citing Hale v. Bowen, 831 F.2d 1007, 1011-12 (11th Cir. 1987)).

Plaintiff argues that by satisfying the three-part pain standard, he "has met his burden in proving his disability." (Plaintiff's brief, p. 13).  A plaintiff's testimony about subjective symptoms and evidence which meets the pain standard may be sufficient to establish disability. See Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995)).  However, plaintiff's argument ignores the fact that an ALJ may reject subjective testimony – even if it is accompanied by evidence meeting the pain standard – so long as the ALJ articulates adequate

6

and specific reasons, supported by substantial evidence, for doing so.

In this case, the ALJ determined that plaintiff's allegations of disabling pain and functional restrictions were disproportionate to the objective evidence. (R. 16). With regard to plaintiff's cardiac problems, the ALJ noted the successful angioplasty with stent placement which reduced the narrowing in the left anterior descending coronary artery from 100% to 30% and the September 3, 1999, electrophysiologic protocol showing no inducible ventricular arrhythmias. (R. 16-17; see also R. 129, 143-44). As to plaintiff's COPD, the ALJ noted that plaintiff's June 1, 2004, spirometry report showed only mild obstruction. (R. 17; see also R. 111-15).

The ALJ noted that, although plaintiff's degenerative disc disease of the cervical spine and history of fractures to his lumbar spine and right ankle might reasonably cause some pain, the medical record suggests that the pain has been intermittent in duration and mild to moderate in severity. The ALJ observed that although a CT scan during plaintiff's May 1999 hospitalization revealed disc bulging at multiple levels in the cervical spine with joint hypertrophy at C2-3 and C3-4 and mild to moderate canal narrowing at C3-4, plaintiff then denied experiencing any neck pain. (R. 17; see also R. 162, 194). The ALJ also referenced the November 8, 1999, physical examination, when plaintiff reported to the emergency room with complaints of left shoulder pain and left hand tingling, which showed that plaintiff was neurologically intact and his extremities were within normal limits with no focal numbness or weakness. (R. 17; see also R. 140-41). Additionally, the ALJ observed that, upon examination at the emergency room on September 6, 2001: (1) x-rays were unremarkable

except for some degenerative changes in plaintiff's neck; and (2) the physician noted that plaintiff was "a little bit tight" in his left shoulder and had neck pain upon movement of his shoulder, but that he had equal grip strength and symmetrical reflexes. (R. 17; see also R. 137-38). The ALJ also cited plaintiff's March 1996 x-ray, which revealed that his ankle fracture had healed. (R. 18; see also R. 150 (physician's observation that ankle is "clinically and radiologically healed")). He further noted that medical records indicate that plaintiff's leukemia is in remission. (R. 18; see also R. 255-56 (expert testimony that plaintiff's 1999 blood count was normal and showed that plaintiff's leukemia was apparently in remission)). The ALJ's determination that plaintiff's allegations of disabling pain and functional restrictions were disproportionate to the objective evidence is supported by substantial evidence.

The ALJ further concluded that "inconsistencies in the record tend to lessen claimant's credibility." He stated:

> To give a couple of examples: (1) On March 24, 2004, the claimant wrote that a cane helped him to stay up when he walked (Exhibit 4E). And yet, less than two months later, on May 3, 2004, Dr. Stauffer noted that claimant used no assistive device for ambulation (See Exhibit 1F). (2) The claimant told Dr. Stauffer that he needed to hold on to furniture when walking around his house but did not use the cane or walker that had been provided to him (See Exhibit 1F). (3) Contrary to alleged functional limitations, the claimant is independent in his activities of daily living. He lives alone. He takes care of his personal needs, prepares meals, does household chores and laundry at his own pace but needs no assistance from others. He has no limitations with regard to shopping, performing yard work or driving (See Exhibits 4E, 1F). (4) The claimant last worked as a truck driver in 2003. He stopped working because of his impairments. And yet, he renewed his commercial driver's license in 2004, which suggests that he does not see himself as disabled (See testimony).

These additional reasons cited by the ALJ are adequate and are also supported by substantial

evidence of record.  (R. 82, 84, 85, 99, 101, 247-49).

<u>ALJ Improperly Substituted His Own Opinion or Conclusion</u>

Plaintiff argues that the ALJ improperly "substituted his own opinions and conclusions" when he stated that the claimant had not required hospitalizations, emergency room visits or any type of doctor intervention for his hairy cell leukemia since 1997, and when he stated that the claimant has not had any further heart troubles after his angioplasty in 1999.  (Plaintiff's brief, pp. 13-14; R. 18).  It is well-established that an ALJ may not substitute his own judgment for that of medical or vocational experts.  <u>See</u> <u>Freeman v. Schweiker</u>, 681 F.2d 727, 731 (11th Cir. 1982); <u>see also</u> <u>Marbury v. Sullivan</u>, 957 F.2d 837, 840 (11th Cir. 1992)(Johnson, J., concurring)("An ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians[.]").  In this case, there is no opinion from a medical professional that contradicts the ALJ's statements and, thus, no medical opinion for which the ALJ could have substituted his own judgment.

Plaintiff's real complaint appears to be not that the ALJ has "substituted" his judgment, but that he has drawn a conclusion from the absence of any medical evidence in the record showing treatment for leukemia after 1997 or for heart problems after 1999.  Plaintiff testified that he could not afford medical treatment or medications.  Plaintiff argues that the "lack of medical treatment is not indicative of good health but lack of money and insurance for medical treatment." (Plaintiff's brief, p. 14).  However, the plaintiff bears the burden of proving disability.  To assist him in evaluating plaintiff's claims, the ALJ ordered

9

a consultative examination. He also obtained the assistance of a medical expert at the hearing in assessing plaintiff's residual functional capacity. The ALJ was not required to presume that additional records of medical treatment, had plaintiff sought such treatment, would have supported plaintiff's allegation of disability.[2]

Residual Functional Capacity

Plaintiff contends that the ALJ's assessment of plaintiff's residual functional capacity is flawed because the ALJ failed to consider the limitations of chronic obstructive pulmonary disease when he found that plaintiff was "unlimited in his ability to work at activities involving extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation." (Plaintiff's brief, p. 14; see R. 20). However, the ALJ's determination is supported by substantial evidence. At the administrative hearing, the ALJ took expert medical testimony from Dr. Jack Evans. (See Exhibit 7B and R. 255-58). Dr. Evans testified, after reviewing plaintiff's medical records, that he would be limited to work at the light exertional level, with limitations to occasional stooping, crouching, kneeling, and crawling. He noted plaintiff's diagnosis of "minimal COPD or chronic obstructive disease." (R. 256). On further questioning by plaintiff's attorney, Dr. Evans modified his opinion to include a limitation on plaintiff's use of his left arm to occasional lifting above the horizontal. (R. 257-58). When questioned about testing for the chronic obstructive pulmonary disease, Dr. Evans explained that the pulmonary function test "showed only a

---

[2] It appears from the ALJ's opinion that the plaintiff may have previously established an entitlement to SSI between 2000 and 2002. If this is so, plaintiff was automatically eligible for Medicaid. See Alabama Medicaid Administrative Code, Rule 560-X-1-.04. However, the ALJ did not rely on this eligibility in reaching his determination and the court likewise does not consider it.

10

very slight reduction in the FEVI."[3] (R. 258; see also R. 111, Spirometry Report showing "mild" obstruction). It is apparent that Dr. Evans relied on the results of pulmonary function testing when he rendered an expert medical opinion regarding plaintiff's residual functional capacity. The ALJ was entitled to rely on Dr. Evans' opinion in reaching his conclusions regarding plaintiff's residual functional capacity, and the ALJ's determination that plaintiff has no environmental limitations is supported by substantial evidence.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner reflects correct application of legal standards and is supported by substantial evidence. Accordingly, the decision is due to be AFFIRMED. A separate judgment will be entered.

DONE, this 5th day of April, 2007.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

[3] The $FEV_1$ is the one-second forced expiratory volume. *Stedman's Medical Dictionary* (26th ed.) at 638.